**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IAIN WALKER,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **Case No. 11 C 2967** |
| | ) | |
| **NORENE WALKER,** | ) | |
| | ) | |
| Respondent. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>[1]

MATTHEW F. KENNELLY, District Judge:

In early May 2011, Iain Walker, a citizen of Australia, filed suit under the

International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601, against his

then wife Norene Walker, a United States citizen, seeking to compel her to return their

three children to Australia.  ICARA is a federal statute that implements the Hague

Convention on the Civil Aspects of International Child Abduction (Hague Convention).

Because the parties have the same last name, the Court will refer to them by their first

names.

In September 2011, another judge of this court conducted a bench trial on the

petition, and, on October 20, 2011, he ruled in Norene's favor.  The court of appeals

---

[1] On Friday, March 15, 2013, the Court entered a brief order expressing its conclusions, directing the entry of judgment in favor of petitioner, and ordering the children's immediate return to Australia.  The order stated that a detailed explanation of the Court's ruling would follow.  This opinion constitutes that explanation.  The Court explained in the March 15 order its rationale for directing immediate entry of judgment and thus need not repeat it in full here. Among the reasons the Court cited was the fact that the oldest of the three Walker children was about to "age out" under article 4 of the Hague Convention due to her impending sixteenth birthday.  The Court notes that the oldest child will turn sixteen on Monday, March 18, 2013.

summarized the prior district judge's ruling as follows:

> [The judge] found that notwithstanding the fact that the Walker family lived
> in Australia from 1998 through 2010, the children's habitual residence had
> become the United States by the time Iain had filed his petition. In
> addition, as the court saw it, Norene's act of keeping the children in the
> United States could not have been "wrongful" within the meaning of the
> [Hague] Convention for two reasons: first, Iain was not exercising his
> custody rights at the time; and, second, Iain had consented to the
> children's remaining in the United States permanently.

*Walker v. Walker*, 701 F.3d 1110, 1114 (7th Cir. 2012).

Iain appealed from the judgment, and the children remained with Norene here in the United States while the case was on appeal. The court of appeals heard argument in September 2012, and it decided the case in mid-November 2012. The court found that the district judge had erred in certain respects. In particular, the court overturned as insufficiently supported the district judge's determinations that the United States was the children's habitual residence at the relevant time; that Iain had abandoned the children and was not exercising his rights of custody at the relevant time; and that Iain had consented to the children remaining in the United States. Rather than reversing outright, the court remanded the case for further proceedings. Near the end of the court's decision, it stated as follows:

> Several crucial issues were not fully developed in the previous proceedings, and
> these gaps in the record must be filled before a final decision is rendered. On
> remand, the district court must resolve at least the following questions, taking
> evidence as necessary:
>
> 1.      What was Iain and Norene's mutual intent regarding the trip to the United
> States in June 2010? Was this intended as an extended vacation or as a
> permanent move?
>
> 2.      What has been the precise nature of Iain's participation in the Illinois
> divorce proceedings, and to what extent, if at all, does this participation indicate
> that Iain either consented to or acquiesced in the children's retention in the
> United States?

> 3. To the extent the children have "attained an age and degree of maturity at which it is appropriate to take account of their views," [Hague Convention] Art. 13, what is the children's attitude to being returned to Australia? In conducting this inquiry, we caution that the district court must be attentive to the possibility that the children's views may be the product of "undue influence" of the parent who currently has custody. 51 Fed. Reg. 10510.

*Id.* at 1123.

The court issued its mandate on January 18, 2013 after it denied a petition for rehearing en banc. The district judge who had conducted the prior bench trial concluded that the case should be reassigned, and it was reassigned to the undersigned judge on January 30, 2013. Because of the extended period the case had been pending since its inception, and given the nature and importance of the proceedings, the Court set the case for a prompt trial following consideration of preliminary matters and allowing limited and expedited discovery.

The trial was conducted on Thursday, March 14, 2013, with closing arguments the following day. The parties agreed that the Court could consider the testimony from the previous trial and the exhibits admitted at that trial. The Court also heard further testimony from Iain (who testified under oath by video from Australia), Norene, and their three children. Thus the Court had the opportunity to observe, and has taken into account, the demeanor of each of the witnesses, as well as other factors bearing on their credibility. The attorneys made closing arguments on Friday, March 15, 2013.

In deciding this hotly contested matter, the Court has paid heed to the admonition the court of appeals made in the concluding paragraph of its decision:

> In returning this case to the district court, we emphasize again that this is a dispute about which court system should resolve the underlying issue of child custody; it is not a dispute about which parent is preferable or the terms under which custody will be granted. We are confident that either

the courts of Western Australia or the courts of Illinois are fully capable of resolving these matters.

*Id.* at 1123-24. The following constitutes the Court's findings of fact and conclusions of law.

## Discussion

A petition under ICARA is determined in accordance with the Hague Convention. 42 U.S.C. § 11603(a). Article 3 of the Hague Convention provides that a child's removal or retention is wrongful if:

> a) it is in breach of rights of custody attributed to a person . . ., either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Conv., Art. 3. This is a case of alleged wrongful retention, not wrongful removal. *See Walker*, 701 F.3d at 1118. If a child has been wrongfully retained within the meaning of Article 3, "the authority concerned shall order the return of the child forthwith," unless the petition was untimely, which is not the case here. Hague Conv., Art. 12. The Hague Convention also provides, however, that a court "is not bound to order the return of the child" if the person opposing return establishes, among other defenses, that party seeking return "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention . . . ." *Id.*, Art. 13(a). In addition, a judge "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Id.*, Art. 13.

4

## A.    Wrongful retention of the children

ICARA provides for the return of a child wrongfully retained in the United States in violation of the Convention.  42 U.S.C. § 11603(b).  Wrongful retention is defined as retention in breach of rights of custody vested in the party who complains of the retention.  *See Pielage v. McConnell*, 516 F.3d 1282, 1286 (11th Cir. 2008); *see also Norinder v. Fuentes*, 657 F.3d 526, 533 (7th Cir. 2011) (defining wrongful removal).  "To prevent forum shopping, rights of custody are defined according to the law of the country that is the child's habitual residence."  *Norinder*, 657 F.3d at 533.

The first step, therefore, is to determine the children's habitual residence at the relevant time.  As the Seventh Circuit stated in its decision in this case, to prevail, Iain is "required to show that Australia was the children's habitual residence at the time of their retention in the United States."  *Walker*, 701 F.3d at 1119.  The time of the children's retention in the United States by Norene was, at the latest, late January 2011.  Norene testified that this was when she first formed the intention to remain in the United States and not return the children to Australia.  (The Court will discuss this point in greater detail below.)  One conceivably could conclude that Norene retained the children in the United States earlier, such as when Iain returned to Australia in July 2010 or when Norene filed for divorce in Cook County, Illinois in early November 2010, seeking sole custody of the children (although Norene denied that at the first trial).  The analysis would remain the same, however, and any earlier retention date would not result in a ruling more favorable to Norene on the question of the children's habitual residence at the relevant time.[2]

---

[2]  The earlier the date, the closer the children's connection to their Australian residence.

It is undisputed that the Walkers resided in Australia from 1998 through June 2010. Iain contends that Australia remained the family's and the children's habitual residence as of the relevant time. Norene contends that at the relevant time, they had abandoned their residence in Australia and established residence in the United States.

In a case of alleged wrongful retention, a court determines a child's habitual residence "by asking whether a prior place of residence was effectively abandoned and a new residence established by the shared actions and intention of the parents coupled with the passage of time." *Walker*, 701 F.3d at 1119 (internal quotation marks and ellipsis omitted). "Because the parents often dispute their intentions, the court should look at actions as well as declarations in determining whether the parents shared an intent to abandon a prior habitual residence." *Id.* (internal quotation marks omitted).

Iain has proven by a preponderance of the evidence that the Walkers did not have a shared intention to abandon their residence in Australia and establish a new residence in the United States. This is not a close question, and the Court would make the same finding even if Iain had a far more stringent burden of persuasion. The proposition is amply established by the testimony of both parties as well as their earlier statements and actions and the circumstantial evidence.

Iain and Norene were married in Chicago, where Norene's parents live, in 1993. They lived in Seattle, Washington until 1998, and their first child was born there in 1997. They moved to Perth, a city in Western Australia, in 1998, when their first child was about one year old. Iain and Norene's two younger children were born in Australia in 1999 and 2001.

Norene testified that she and Iain initially intended to live in Australia for five

years and then relocate to the United States. She testified that she agreed to marry Iain only on that condition. They actually lived together in Australia, however, for twelve years, until 2010. As the Seventh Circuit stated in its ruling, and as the evidenced presented to this Court shows,

> [o]ver this period, they and their children appeared to be well-settled: they owned a home, furniture, and a dog named Chubba; the children attended school, had friends, and participated in activities; and Iain worked as a software test engineer while Norene cared for the children.

*Walker*, 701 F.3d at 1114.

Iain, Norene, and their children traveled to the United States in June 2010. The Seventh Circuit stated, and this Court finds based on the evidence presented, that "[w]hen they left Australia, both Iain and Norene expected that Norene and the children would remain in the United States for six months to one year." *Id.* Norene contends, however, that this trip was intended "as an extended prelude to a permanent move to the United States." *Id.* at 1115. As noted above, Norene testified that she married Iain on the condition that after five years, they would relocate in the United States. She contends that the June 2010 trip represented the fulfillment of that condition, or at least the initial steps toward its fulfillment. Iain contends, by contrast, that they intended for Norene and the children to live with Norene's parents in Chicago while the family demolished their house in Perth and built a new one, at which point Norene and the children would return to Australia and resume living there indefinitely. *Id.* at 1114-15. It is undisputed that their home in Perth was demolished and that construction of two new homes on the property was to begin thereafter. Iain says that the family planned to live in one; Norene says they planned to sell both.

As noted earlier, the Court must determine whether Iain and Norene had a

"shared intention" to abandon residence in Australia and establish residence in the United States. The evidence overwhelmingly shows that they did not have a shared intention to do so at any time relevant to this case.

The Court found credible Iain's testimony that he did not intend to relocate himself or the family permanently to the United States and that the purpose of the extended stay in this country was to allow demolition and reconstruction of the family's home in Perth. Iain's testimony was supported by the objective circumstantial evidence surrounding the family's travel. Each child traveled to the United States with a single suitcase and backpack, and Norene likewise traveled with a single suitcase. They did not at any time ship or arrange to ship any of their remaining property to the United States. Rather, all of it remained in Australia. The family dog, Chubba, likewise remained in Australia, without any arrangements made, at any time, to move him to this country – for dog lovers, a rather clear indication of the owners' intention to return home.

Iain returned to Australia and to his work around a month after the family traveled to the United States. This, too, is a clear indication of the absence of a shared intention between Iain and Norene to abandon the family's Australian residence. Iain never made nor initiated arrangements to obtain the necessary documentation that would permit him, as an Australian citizen, to work in the United States. Norene testified that Iain agreed to look for work in this country and that they had discussed and looked into getting a "green card." That testimony, like a good deal of Norene's testimony, was not credible. Among other things, were it true, one would have expected some evidence or testimony (even by Norene) that Iain, at some point, actually looked into job

opportunities in the United States, but there was no such evidence. Nor is there any evidence of any actual effort on Iain's part to obtain permission to work in this country. In this regard, actions speak just as loudly as words: Iain returned to Australia in July 2010 to resume work there.[3]

The Court also found credible Iain's testimony that he did not participate along with Norene in what she described as initial efforts to look for a home in the United States. The Court does not doubt that Norene might have made taken some relatively minor initial steps to determine what the home market was like in Seattle and/or San Francisco. The Court likewise does not doubt that Norene may have wanted to eventually establish residence in the United States. The Court found no credible evidence, however, that Iain participated in any steps to check the market or look for a home in the United States or that he had any intention, at any relevant time, to consider establishing residence in this country, either in 2010-11 or thereafter.

Norene testified that she and Iain made an agreement before traveling to the United States in June 2010 that they would settle in this country and that the two homes being built on their property in Perth would be sold and the proceeds used to buy property in this country (preferably, she testified, in Seattle). This testimony lacked credibility. The Court has already found that Iain had no such intention. But the evidence also convincingly demonstrates that Norene *herself* did not have the intention of abandoning the parties' Australian residence when the family came to the United

---

[3] During the evidentiary hearing before the previous district judge, the judge – an expert in immigration law – pointed out that it would have been quite simple for Iain to obtain permission to work in the United States given the fact that Norene is a U.S. citizen. The Court does not question this. It is more significant, however, that there is no credible testimony or any other evidence of any actual attempt, effort, or investigation by Iain (or for that matter Norene) in this regard.

States in June 2010.  Among other things, any such contention is flatly contradicted by Norene's two written statements, made to Australian school authorities in May 2010, that they would be overseas from June 2010 only through June 2011, "visiting grandparents [and] relatives."  Petitioner's Ex. 3; *see also* Petitioner's Ex. 4 ("visiting parents['] homes, visiting grandparents / family").  In addition to these written statements, Norene admitted that she told the principal of the children's school that they family would be returning to Australia within six months or a year after June 2010.  *See, e.g.*, Initial Trial Tr. 54.  She also admitted that she had advised "any number of people" that she was intending to return to Australia within six to twelve months.  *Id.* 23-24.  She said just that in an e-mail she wrote to two friends in January 2010.  Petitioner's Ex. 5 ("We're coming over this summer and the kids and I will stay until Christmas and possibly til June 2011 (depends on the children keeping up with their Australian studies).")

Of at least equal importance is Norene's own testimony regarding when she formed the intention to remain in the United States.  Norene testified several times during the initial trial before the previous district judge that this did not occur until January 2011.  First, Norene unequivocally testified that she had *never* told Iain that her intention was not to return to Australia:

> Q:  . . .  Did you ever tell your husband when you were coming to America on June 4th, 2010, that it was never in your intention to return to Australia?
>
> A:  *I mean, no.*  That all changed when he made me that offer letter.

Initial Trial Tr. 25 (emphasis added).[4]  She testified, equally unequivocally, that before

---

[4] Norene's reference to an "offer letter" is a reference to a letter she received from Iain dated January 21, 2011.

"that" – her receipt of a letter from Iain in January 2011 proposing a divorce settlement –

she *had not made up her mind* about whether she would stay in the United States.  *Id.*

26.  And this was not just a passing reference in Norene's testimony; she

unambiguously  reaffirmed it later in her testimony, more than once:

> Q:  So, ma'am, you didn't make up your mind that you were going to stay
> in America until January 20 or 2011, is that correct, ma'am?
>
> Excuse me.  I apologize.  You didn't make up your mind that you were
> going to stay in America until January 30th, 2011, isn't that correct?
>
> A:  Is that the date – I just don't know the date off the top of my head.
>
> Q:  Assuming that's the date of the alleged offer letter.
>
> A:  When I received the offer letter.

*Id.* 27.

> Q:  Well, ma'am, you indicated yesterday that until June [sic] 21st of 2011,
> you had no intention of staying in the United States permanently, isn't that
> correct?
>
> A:  Yes.  That's correct.

*Id.* 89.  And finally, under questioning by her own attorney, Norene again repeated this

testimony:

> Q:  Now you previously testified that when you came back to the United States in
> June of 2010, that you intended to return, is that correct?
>
> A:  Yes.  That's correct.
>
> Q:  And now you don't intend to return, is that correct?
>
> A:  Yes.  That's correct.
>
> Q:  What happened that caused you to change your mind?
>
> A:  The letter I received of offer from Iain that he, you know, gave me residence
> here. . . . .

*Id.* 226.

One of the Walkers' children likewise testified at the first trial that the family's intention was to take an extended vacation in the United States, which would include them attending school here, and then return to Australia:

> [A]t first, my dad didn't want to come over with us to go on this vacation but then he decided to, I think, and we had a great time. We went hiking in Seattle and it was really, really fun. And he stayed with us a little bit during the summer and then he left before we moved upstairs, I think, and – yeah. Then – yeah. He told us that we were supposed to come back but mom said that we were supposed to – I think they both said that we were supposed to stay here for a little bit of schooling. This is what we were told before we came to Australia [sic].

*Id.* 203.

During her testimony at the trial before this Court, Norene initially reconfirmed, several times, her testimony that she *first* decided to stay here after she received Iain's letter in January 2011 and that she *first* decided to live her permanently after getting that letter. She then attempted to backtrack, however, stating that she had told Iain twice when they came to the United States in June 2011 that she never intended to return. This testimony, which directly contradicted her testimony at the earlier trial, was utterly lacking in credibility, and it was thoroughly impeached. Norene's attempt to shift ground, together with her demeanor during that testimony and the corresponding impeachment, seriously undermined her credibility. She ultimately confirmed – albeit with some visible reluctance – that she had intended to tell the truth in her testimony on these points at the initial trial, but the damage to her credibility was already done.

Now it is certainly possible, at least in theory, that the evidence that convincingly demonstrates the parties' shared intention that the entire family would be back in Australia within six months to a year after June 2010 is still consistent with a shared

intention to *later* abandon their Australian residence and move permanently to the United States. Norene's counsel did not make this argument in his closing argument before this Court. But even were the Court so to find, it likely would not assist Norene in this case. What is relevant is the habitual residence at the time of the alleged wrongful retention of the children – which took place in January 2011 at the latest. In addition, however, such a theory is completely undermined by Norene's repeated testimony that she first formed the intention to stay in this country in late January 2011. In any event, though Norene may have wanted to establish residence in the United States at some point, what is controlling is whether there was a *shared* intention to establish residence. The Court finds that there was no such shared intention.

To answer the first question that the court of appeals posed at the end of its decision, Iain and Norene's mutual intent regarding the June 2010 trip to the United States was that it was *not* a permanent move or even a prelude to a permanent move. Rather, it was a temporary stay. The Court is unsure whether the term "extended vacation," as used by the court of appeals, is a precise description, but at most the trip was an extended leave of absence from Australia with the intent to return to their permanent residence that country. There was no shared intention to abandon Australia as their residence and establish residence in the United States. In sum, the Court finds that Iain has proven that the children's habitual residence was Australia as of the time of the alleged wrongful retention.

The next question is whether Norene's retention of the children was in breach of Iain's custody rights under Australian law. It is not seriously disputed that Iain had, at the relevant time, the right of joint custody of the children under Australian law.

Norene's counsel contended in closing argument that under Australian family law – counsel referred to "Article 66" – a person has custodial rights only if he is paying child support. Norene made no attempt to establish this by testimony or other evidence, and her counsel did not provide the Court with the Australian statute he cited. The Court has attempted to track this down on its own. The current version of the Australian Family Law Act that is available online is 736 pages long in the PDF version. Article 66 itself is quite lengthy, covering seventeen pages of single-spaced text. Norene's counsel made no effort to point the Court to the particular section(s) or provision(s) upon which his argument was based. Based on the Court's review, Article 66 appears to concern child maintenance orders (i.e., child support), not custodial rights.

The Court considers Norene to have forfeited this argument due to the utter absence of any reasonable effort by her counsel to support it; leaving it to the Court to wade through a complex and detailed 700-plus page statute does not cut it. But even if Norene's counsel has correctly characterized Australian law, it does not help her in this case. The evidence establishes that Iain continued to provide financial support to the children throughout the relevant period, through January 2011. Specifically, the testimony is uncontradicted that he wired or sent her the equivalent of $20,000 and that she had free access to their joint credit card account through January 2011.

Norene's counsel cited a line in the default judgment entered in her Illinois divorce case in March 2012 as establishing that Iain had provided no support for the children as of November 2010. Specifically, paragraph 3B of the default divorce decree, which concerns custody of the children, states:

> The Court finds that it is in the best interests of the children that the petitioner be awarded sole custody of the children and that the children

> remain with the petitioner since the Respondent has abandoned the children and has provided no support for the children since the filing of the Petition.

Respondent's Ex. 30, ¶ 3B.  The Illinois custody order, however, has no force and effect here, because under ICARA and the Hague Convention, the courts of Australia, the children's habitual residence at the time, had the rightful power to resolve the issue of custody, not the courts of the United States.  The Hague Convention does provide that a court considering a petition challenging a child's wrongful retention "may take account of the reasons" given by a court ruling on custody in the country of retention.  *See* Hague Conv., Art. 17.   But this particular "reason" – the purported absence of support since "the filing of the [divorce] Petition" in November 2010 – is contrary to the uncontested evidence before this Court.  The Court also notes that the default divorce decree was entered *after* the uncontradicted testimony before the previous district judge in September 2011 that Iain had sent Norene a significant amount of money as previously discussed and that she had use of their joint credit card through January 2011.  One wonders what evidence or other basis Norene and her counsel provided the Illinois state court judge to support the finding that Iain had provided no support for the children since all the way back in November 2010.  That aside, though this Court certainly takes account of the state court order, it gives that order no effect in view of the fact that it is contrary to the undisputed evidence presented before this Court.

In sum, the Court finds that Iain has met his burden of providing that Norene's retention of the three children, which took place at the latest in late January 2011, breached his rights of custody under the law of Australia, which is where the children were habitually resident immediately before the retention.

The Court also finds that Iain was actually exercising his rights of custody up through and at the time of Norene's retention of the children.

> The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child. Indeed, a person cannot fail to 'exercise' [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.

*Walker*, 701 F.3d at 1121 (internal quotation marks omitted).

The district judge who conducted the first trial concluded that Iain had abandoned the children after returning to Australia in July 2010 and at the latest in January 2011. This conclusion appears to have been based largely on evidence that the Seventh Circuit concluded should have been excluded for this purpose. One way or another, however, this Court respectfully disagrees with the previous judge. The admissible evidence is all to the contrary. First, as of July 2010 and for a significant period thereafter, Iain believed that Norene and the children would be returning to Australia sometime between December 2010 and June 2011 (as did Norene, given her testimonial and other admissions on that point). Thus his return to Australia cannot be viewed as abandonment, any more than any parent who works in a separate city from his children may be considered by that fact to have abandoned them. Nor does Iain's non-return to the United States between then and January 2011, the latest date on which Norene's retention of the children occurred, suggest abandonment. It is undisputed that Iain was in frequent contact with the children during this period via telephone and Skype, and for a good deal of it, he had no reason to believe that anything had changed. The evidence is likewise uncontradicted, as the Court has already discussed, that Iain sent money to Norene and that she had unrestricted ability

to use their joint credit card. Nothing changed in this regard changed between November 2010, when Norene filed for divorce, and late January 2011. Norene still had access to their credit card,[5] and Iain remained in frequent contact with the children, as he does to this day. There was no abandonment of the children by Iain, and he was actually exercising his custody rights at the relevant time.

For these reasons, the Court concludes that Iain has established the necessary elements of a claim of wrongful retention under article 3 of the Hague Convention.

## 2. Exceptions / defenses to return of children

Norene has asserted certain exceptions under the Hague Convention that authorize a court not to order the return of a child wrongfully retained or removed. *See* Hague Conv. art. 13. Defenses under the Hague Convention are construed narrowly "so their application does not undermine the express purposes of the Convention." *Yang v. Tsui*, 499 F.3d 259, 278 (3d Cir. 2007); *see also, e.g., Larbie v. Larbie*, 690 F.3d 295, 308 (5th Cir. 2012); *De Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir. 2007); *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995). Norene bears the burden of proving any such defense by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B).

Norene appears to contend, at least implicitly, that Iain was not actually exercising custody rights at the time of the retention. *See* Hague Conv., art. 13(a). The Court has already found that Iain has proven that he was, in fact, exercising those rights. For the same reasons, Norene has failed to prove otherwise by a preponderance of the evidence.

---

[5] The credit card was later cancelled, but not by Iain. Rather, the evidence is uncontested that the bank that issued the card terminated it due to fraudulent charges made in the New York area.

Norene also contends that Iain had consented to, or subsequently acquiesced in, the retention of the children by Norene in the United States. She has failed to prove either by a preponderance of the evidence, and again, the evidence is not close. Iain took prompt steps to seek relief via the Hague Convention. *See Walker*, 701 F.3d at 1115. He has consistently and diligently pursued his petition for relief under the Convention and ICARA ever since that time, through the present day.

In arguing acquiescence, Norene relies on Iain's participation in the Illinois divorce proceedings, and perhaps on his later non-participation in those proceedings. Iain participated in the Illinois divorce proceedings via counsel until approximately the end of January 2012. He answered the divorce petition in August 2011. In late December 2011, Iain filed a motion for summary judgment in the Illinois divorce case, arguing, based largely on Norene's September 2011 testimony in the present case, that the Illinois court lacked jurisdiction because neither of the parties was a resident of Illinois (as Illinois law defines that term) at the time Norene filed the divorce petition. Nothing about this or any other aspect of his participation in the case suggests acquiescence in the children's retention in the United States.

In late January 2012, Iain's Illinois attorney withdrew from the divorce case at his request. Iain testified that he ceased participating in the Illinois divorce proceedings because he believed the Illinois court lacked jurisdiction but would not give him or his arguments fair consideration. Even if his belief was incorrect, and even if one might argue that it did not warrant a cessation of his participation in the Illinois divorce case, there is nothing about Iain's actions that suggests that this represented acquiescence in the children's retention in the United States. Even while ceasing participation in the

Illinois divorce case, Iain continued to pursue vigorously in this court and on appeal his challenge to Norene's retention of the children. The Court finds based on the evidence that Iain's ongoing challenge to Norene's retention of the children has been part of a genuine and good faith effort to assert and seek appropriate adjudication of his custodial rights. In case the point needs to be made even clearer, the Court finds that Iain has not challenged the children's retention here simply to give him a bargaining chip in the parties' divorce proceedings. The admissible evidence does not support such a conclusion.

Nor did Iain consent to the children's retention in the United States in the first place, to the extent that remains an issue. As the Court has already discussed at length in connection with the habitual residence and wrongful retention issues, the parties' mutual intention was that the children would return to Australia within six to twelve months after their arrival in the United States in June 2010. As the Court has stated, the evidence overwhelmingly supports this finding. Things changed, as Norene herself testified, only months later, in January 2011. The evidence does not support a conclusion that Iain consented at any time before that to the children's retention in the United States.

Norene also cites the fact that Iain obtained, at Norene's request, school records for the children to facilitate their enrollment in school here. This does not support a contention that Ian consented to or acquiesced in their retention here. First, this appears to have occurred in September 2010, before Norene wrongfully retained the children here and even before she filed for divorce. *See* Respondent's Ex. 49. At that point, getting the school records was completely consistent with the parties' shared

intention to have the children stay in the United States for six months to a year and then return. In any event, a parent's cooperation in making sure his children are properly educated can hardly be viewed as indicating acquiescence in their wrongful retention in another country.

In sum, Norene has failed to support her defenses under article 13(a) of the Hague Convention. And to make clear this Court's answer to the court of appeals' second question at the end of its decision, Iain's participation and non-participation in the Illinois divorce proceedings does not indicate that he either consented to or acquiesced in the children's retention in the United States.

The third question posed by the court of appeals involves the application of the child objection provision of the Hague Convention. Article 13 of the Hague Convention states that a judicial authority "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Conv. art. 13.

"As with any of the affirmative defenses under the Convention, this defense is to be construed narrowly." *Yang*, 499 F.3d at 278; *see also England v. England*, 234 F.3d 268, 272 (5th Cir. 2000). "The exceptions are construed narrowly so their application does not undermine the express purposes of the Convention." *Yang*, 499 F.3d at 278 (internal quotation marks omitted). In addition, application of the child objection exception is discretionary. Specifically, even if the exception is proven, a court has the discretion to order the return of the child if it would further the aim of the Convention, which is to provide for the return of a wrongfully removed or wrongfully retained child. *Silva*, 481 F.3d at 1285; *see also Yang*, 499 F.3d at 278.

During the initial trial before the previous judge, each of the three children was questioned in the presence of counsel but not the parties, informally, while sitting around a table. This Court followed the same practice at the trial just conducted.

The three children are a fifteen year old girl who will turn sixteen on March 18 of this year, a thirteen year old boy who will turn fourteen in August, and an eleven year old girl who will turn twelve in June. All three are bright and pleasant children, and they were all responsive to questions, though the two girls appeared a bit more outgoing than the boy. The older daughter had a sheet of handwritten notes that she consulted from time to time.

All of the children are doing well in school, better than they were doing during the period shortly after they first came to the United States. All of them are involved in activities here. They expressed the view that there were better opportunities here than in Australia. The children all reported that they like living here and with their mother. They also all reported that they had frequent contact with their father by telephone and Skype. The oldest daughter still has contact with some of her friends from Australia, and all of them remember living there and that they liked it when they were there. The middle child stated that he is a bit angry with his father and disappointed that his father had "ordered a retrial," which he said he had learned from his mother. (The Court attempted to explain to him that the "retrial" had been ordered by judges, not by his father.) All three of the children expressed their desire to remain in the United States, with their mother.

The Court finds that the two older children have reached an age and maturity at which it is appropriate to take account of their views. This is arguably a closer question

for the younger daughter, but the Court will assume for purposes of discussion that she likewise has reached a sufficient age and maturity for the article 13 provision to apply.

A court must take care not to give significant weight to a child's views if the child has been unduly influenced by the respondent parent. *See, e.g., Walker v. Kitt*, ___ F. Supp. 2d ___, 2012 WL 5237262, at *5 (N.D. Ill. Oct. 24, 2012) (citing Dept. of State, *Hague International Child Abduction Convention: Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1984); *In re Robinson*, 983 F. Supp. 1339, 1343 (D. Colo. 1997). There is evidence of that here. First, as indicated earlier, the middle child's apparent anger with his father arises from his mother having told him that his father "ordered a retrial." Second, each of the children made reference to better "opportunities" for education and otherwise, using very similar terminology. The Court might have regarded this as independently derived had it come only from the Walkers' oldest daughter, a high school sophomore, or perhaps from their son, an eighth grader. After the two older children spoke, however, the youngest child, after some initial introductory questions, began her statement about the relevant topics by talking about better education and a lot more opportunities here than in Australia. Given the three children's remarkably similar statements in this regard, the Court is constrained to conclude that their statements were subject of some degree of influence, and it is reasonable to infer that this was from their mother.

Even were that not the case, although the Court found the children quite likeable and respects their views, the circumstances do not warrant giving their views controlling weight. As of the date of the trial, they had been in the United States for just three months short of three years. They have become acclimated to living here, and they

have become settled in. It is both understandable and predictable that they do not now wish to relocate. It is likewise understandable and predictable that they have a far closer connection with their mother, with whom they have lived for this extended period, than with their father. But all of this is, at least in significant part, a direct result of their wrongful retention here by Norene. As the Third Circuit noted in *Yang*, "[a] lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home." *Yang*, 499 F.3d at 280. In such a case, "application of the exception . . . would reward [a respondent] for violating [a petitioner's] custody rights, and defeat the purposes of the Convention." *Id.*

In determining custody, the Australian courts no doubt will take account of all the relevant circumstances, including the fact that the children have all been in school in the United States for an extended period, have friends here, and are involved in activities here. But given the strong likelihood that the children's wishes arise in significant part from the extended time they have spent here already, the direct result of their wrongful retention by Norene, the Court will not decline to order their return to Australia based upon their wishes to remain here.

### Conclusion

For the reasons stated in this Memorandum Opinion and Order and in the Court's order dated March 15, 2013, the Court has entered judgment in favor of the petitioner and has directed the respondent to immediately return the parties' three children to

petitioner in Australia.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 16, 2013